Filed 7/6/26  P. v. Milligan CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br><br>MARQUISE CLAY MILLIGAN,<br><br>    Defendant and Appellant. | B339400<br><br><br>(Los Angeles County<br>Super. Ct. No. MA081750) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa M. Strassner Judge.  Affirmed.

Mark R. Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Dana Muhammad Ali and Seth P. McCutcheon, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Marquise Milligan of the murder of Bobby Mitchell and of personally using a handgun in the commission of that crime. At trial, two eyewitnesses identified defendant as the shooter.

On appeal, defendant contends the trial court violated his due process rights by improperly instructing the jury to consider a witness's certainty in identifying him without also informing the jurors that certainty does not always correlate with accuracy. We find no due process error and, moreover, that any error would be harmless. We therefore affirm the judgment.

## PROCEDURAL HISTORY

A jury convicted defendant of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true an allegation that he personally used a handgun in the commission of the offense. (§ 12022.5, subd. (a).) The trial court sentenced defendant to 25 years to life in prison for the murder, plus a four-year consecutive sentence for the firearm enhancement.

## FACTUAL BACKGROUND

### I.     Evidence at Trial

The prosecution presented the following evidence at trial.

### A.     *Azyria Lewis*

The shooting occurred on July 2, 2021. That evening, Lewis went to Big Shotz bar to meet some friends, including Ryann Anderson. Lewis and her friends left the bar around 1:30 a.m. on July 2, as reflected in surveillance footage from outside the bar. Lewis saw Mitchell outside the bar as she was leaving. Lewis also identified defendant in the bar surveillance footage played for the jury. Defendant was wearing a black baseball cap, white t-shirt, and had a bag with a single strap around one shoulder.

After leaving the bar, Lewis met her friends at a house party. She stayed outside the house for about 30 minutes talking to a group that included Anderson and Mitchell. Lewis saw Mitchell go into the house a few times and come back out.

At some point, Lewis saw defendant come outside with a woman. Lewis had never seen either of them before. Defendant and the woman walked to their car, a red Durango. With the woman driving, the red car sped toward

---

[1]     Undesignated statutory references are to the Penal Code.

Lewis and her friends, who were standing and talking in the street. The car almost hit Mitchell, but stopped just short of a collision. Defendant got out of the front passenger seat, holding a gun, and told Mitchell to move. Mitchell responded, "If you gonna pull it out, you might as well use it." Defendant said, "Oh yeah, Bobby?"

Lewis and Mitchell crouched down behind a nearby parked car and defendant walked toward them. While Lewis was crouching next to Mitchell, she saw defendant shoot Mitchell once in the back. After the shot, Lewis ran. She turned around and saw Mitchell fall to the ground. Defendant stood over Mitchell and fired another shot at him. Defendant then got back into the passenger seat of the Dodge and the car sped off.

Lewis called 911 around 3:31 a.m. The prosecution played the recording for the jury. Lewis reported that Mitchell had been shot twice. She described the shooter and driver as a "light-skinned male and a female" in a red Dodge Durango with black rims.

Lewis admitted that she had been drinking prior to the shooting. She testified that she had less than one drink at Big Shotz and did not have anything to drink at the house party.

Lewis testified that she was able to see defendant's face during the shooting. In addition to identifying defendant at trial, she had identified him as the shooter at the preliminary hearing and from a picture during an interview with a detective from the Los Angeles County Sheriff's Department (LASD). She told the detective, "I can't get his face out of my head" and testified at trial that this was true "[s]till to this day."

**B.** *Ryann Anderson*

Anderson went to Big Shotz on the night of July 1, 2021 with Lewis and another friend. She had been friends with Mitchell for about 12 years and saw him outside the bar that night. Anderson also saw Deja Ratliff, defendant's wife, at Big Shotz. She had known Ratliff for about eight years. Anderson claimed that she had never met defendant but knew "of him" as Ratliff's husband. Anderson claimed that she did not recall seeing defendant at the bar that night.

Anderson and her friends stayed at Big Shotz for an hour or two drinking. As shown on the bar's surveillance video, she left the bar at 1:32

3

a.m.  Afterward, they went to a house party, where Anderson consumed more alcohol.  She and her friends stayed outside the house talking. Mitchell was also with the group.

Anderson recalled seeing Ratliff leave the party, but testified that she could not recall seeing defendant.  She also stated that she did not recall seeing the shooting or telling detectives the details of the incident.  According to Anderson, she heard someone yell, "There's a gun," and everyone started to run.  She saw Mitchell run and hide behind a car, heard two or three gunshots, then heard a car speeding off.  She admitted that she did not want to be testifying at trial and did not want to be involved.

The trial court found Anderson was being deliberately evasive in her testimony and admitted her August 6, 2021 phone interview with an LASD detective as a prior inconsistent statement.  During that interview, Anderson told the detective that she saw both Ratliff and defendant at Big Shotz that night.  She recalled that defendant was wearing a white shirt.  She also thought he might have been wearing a black shirt and jeans, but she was not sure because she was intoxicated.

At the house party, Anderson saw defendant and Ratliff leave the house and get into their car, a red Dodge SUV.  Ratliff, in the driver's seat, accelerated and it seemed like she was going to hit Mitchell. Defendant then pointed a gun out of the car window.  Everyone ran when they saw the gun, including Mitchell, who ran and ducked behind a car. Anderson saw defendant get out of his car, walk up to Mitchell, and shoot Mitchell in the pelvis.  Mitchell fell to the ground on his back, then defendant shot him again in the chest.  Defendant and Ratliff drove away.

### C.  *Investigation*

Deputies recovered two fired gun cartridge casings from near Mitchell's body.[2]  Video from a nearby surveillance camera recorded the sound of two gunshots at 3:23 a.m. and then showed two cars, one a red SUV, heading southbound.  Investigating deputies discovered that Ratliff was the registered owner of a red Dodge SUV.

---

[2]     The parties stipulated that the two casings were fired from the same gun.

4

Video footage from outside the front entrance of Big Shotz showed Mitchell at the bar around midnight, then Ratliff and defendant leaving the bar at 1:35 a.m. Deputies also recovered video footage from Mitchell's cell phone taken at the house party at 3:16 a.m., about seven minutes before the shooting. The video showed Mitchell drinking with other individuals, as well as defendant in the background. In both the video from the bar and from the house party, defendant was wearing a white t-shirt, a black baseball cap with an Atlanta Braves logo, and black Adidas basketball shorts, with a black, single strap backpack across his body.

Analysis of phone records from cell phones belonging to Ratliff and defendant showed both phones near Big Shotz at 11:54 p.m. on July 1, 2021. The phones moved away from the Big Shotz area at 1:44 a.m. on July 2, arriving near the house party address a few minutes later. Both phones began moving away from the house party location around 3:24 a.m., heading south.

Several weeks after the shooting, police detained defendant, who was driving another vehicle in Las Vegas, Nevada. Police recovered a black, single strap backpack from the floorboard on the driver's side of the vehicle, as well as a handgun from the front passenger floorboard. The parties stipulated at trial that the gun recovered from defendant's car was not the one fired at Mitchell. Detectives also recovered a black Braves baseball cap and a pair of black Adidas basketball shorts from the car.

In an interview with an LASD sergeant, defendant identified himself and his clothing in the surveillance footage from Big Shotz. The sergeant told defendant he was trying to decide whether to arrest Ratliff as an accessory to the murder or whether "she's an innocent bystander, and just a witness." Defendant responded, "She's an innocent bystander. For sure.

Defendant did not testify and presented no other witnesses.

## II.     Jury Instructions and Closing Arguments

The court instructed the jury with CALCRIM No. 315, as follows: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony." The instruction then listed 14 factors for the jury to consider in evaluating identification testimony, such as whether the witness

knew or had prior contact with the defendant, what circumstances affected the witness's ability to observe, and whether the witness ever failed to identify the defendant.

As relevant here, the court also included the factor, "How certain was the witness when he or she made an identification?" However, the court did not include the bracketed language following the certainty factor, which cautions that a witness's expression of certainty about an identification "may not be a reliable indicator of accuracy." (CALCRIM No. 315.) The bracketed language continues with a list of factors the jury "may consider when evaluating the significance of the witness's certainty in the identification," including the timing of the witness's expressed certainty, the level of confidence expressed, and whether the "police use[d] procedures that increased the witness's level of confidence." (CALCRIM No. 315.)[3]

In discussions regarding the proposed jury instructions, defense counsel asked the court to include another bracketed factor—whether the witness could identify other participants in the crime—as part of CALCRIM No. 315. The court agreed. Defense counsel raised no objection to the instruction and made no other requests regarding the language.

In closing, the prosecutor argued that the statements by Lewis and Anderson recounting the shooting were corroborated by independent evidence, including the video footage, cell phone records, and physical evidence. He also pointed out that Lewis consistently identified defendant as the shooter, quoting her testimony that "I can't get his face out of my head."

Defense counsel focused his closing argument on "witness reliability." He pointed out inconsistencies in the eyewitness testimonies and argued that Lewis and Anderson were either mistaken or lying in their identification of defendant as the shooter.

---

[3] At the time of trial, the bench notes for this instruction advised the court to include both the certainty factor and the cautionary language, including "any applicable bracketed factors," "[w]henever there is evidence a witness has expressed certainty about an identification." (CALCRIM No. 315.)

**DISCUSSION**

Defendant relies on *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*) to argue that the trial court committed reversible error by including witness certainty among the factors listed in CALCRIM No. 315 that juries should consider in evaluating the reliability of eyewitness identification. He contends that the court was also required to include the cautionary instructions advising the jury that a witness's certainty might not be a reliable indicator of accuracy, and that its failure to do so violated his due process rights.

**I.      Legal Principles**

"A jury instruction may "'so infuse[ ] the trial with unfairness as to deny due process of law."'  However, "'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.  The question is "'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.""""  (*Lemcke, supra*, 11 Cal.5th at p. 655.)  "'It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record.'"  (*Ibid*.)

We review claims of instructional error de novo.  (*People v. Thomas* (2023) 14 Cal.5th 327, 382; *People v. Marquez* (2023) 89 Cal.App.5th 1212, 1218.)  "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner."  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)  We also presume jurors understand and follow the court's instructions.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

**II.     *Analysis***

As an initial matter, respondent contends that defendant forfeited his challenge to CALCRIM No. 315 by failing to object in the trial court. Defendant acknowledges that he did not object but asserts that the rule of forfeiture does not apply because the instructional error affected his substantial rights.  (See *People v. Franco* (2009) 180 Cal.App.4th 713, 719.)  Because "'[a]scertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of

7

the merits of the claim" (*ibid*.), and to forestall defendant's alternative contention that any failure to object arose from ineffective assistance of counsel, we will exercise our discretion to reach the merits of his claim.  (See *People v. Torres* (2025) 113 Cal.App.5th 88, 92; see also *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

Citing *Lemcke, supra*, 11 Cal.5th 644, defendant argues that by instructing the jury with the certainty factor of CALCRIM No. 315 but omitting the accompanying cautionary language, the court violated due process because it failed to correct the jurors' likely impression that the eyewitnesses' certainty equated to a greater degree of accuracy in their identification.

In *Lemke*, the defendant was convicted of assault and robbery, based primarily on the testimony of the sole eyewitness, the victim.  (*Lemcke, supra*, 11 Cal.5th at p. 646.)  The trial court gave an instruction to the jury modeled on a former version of CALCRIM No. 315, including among the relevant factors the witness's degree of certainty in making the identification.  On appeal, the defendant argued that this instruction violated his due process rights to a fair trial, citing empirical research showing that a witness's "confidence in an identification is generally not a reliable indicator of accuracy."  (*Id*. at p. 655.)  By including certainty among the factors to consider, the defendant argued that the instruction implicitly caused jurors to "'place more value than merited on the eyewitness's confidence.'"  (*Ibid*.)

The Supreme Court rejected the due process claim, concluding that "considered in the context of the trial record as a whole, listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating identification testimony did not render [the defendant's] trial fundamentally unfair" or "otherwise amount to a due process violation." (*Lemcke, supra*, 11 Cal.5th at pp. 646, 661.)  The court observed that the instruction "does not direct the jury that 'certainty equals accuracy,'" nor does it "state that the jury must presume an identification is accurate if the eyewitness has expressed certainty."  (*Id*. at p. 657.)  "Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony.  The instruction leaves the

jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Ibid*.) The court further observed that the jury had been instructed that (1) the jurors were responsible for judging the credibility of witnesses, who sometimes make honest mistakes about what they remember; (2) the defendant was presumed innocent; and (3) the prosecution was required to prove the defendant's identity as the perpetrator (as well as the elements of the charges) beyond a reasonable doubt. (*Id*. at 658.) The court also noted that the defendant "had the opportunity to cross-examine [the eyewitness] and the investigating officers regarding her identifications and the procedures used during the photographic lineups," and had "elicited numerous inconsistencies in other aspects of [her] recollection." (*Id*. at 660.) Additionally, the defendant was permitted to introduce expert testimony to combat the potential for jurors to "infer that certainty is generally correlative of accuracy." (*Id*. at pp. 657-658.)

Although it rejected the defendant's due process claim, the *Lemke* court acknowledged that "this form of instruction has the potential to mislead jurors." (*Lemcke, supra*, 11 Cal.5th at p. 665.) As the court explained, "merely directing the jury to consider a witness's level of certainty, without any further caveats, effectively operates to reinforce" the common misconception that an identification made with certainty is more likely to be accurate. (*Id*. at p. 666.) The court therefore exercised its supervisory powers and directed trial courts to "omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Id*. at p. 669.)[4]

Guided by *Lemcke*, we find that the trial court's giving of the same instruction did not violate due process. We are not persuaded by defendant's argument that the facts of his case are more compelling than those in *Lemcke*, such that they rise to the level of a due process violation. Indeed, the

---

[4]    Subsequently, the Advisory Committee on Criminal Jury Instructions revised CALCRIM No. 315 to place the witness certainty factor in brackets, and added the bracketed language advising that certainty does not always correlate with accuracy, with the additional factors to consider.

contrary is true. In *Lemcke*, a single witness identified the defendant, whom she had only observed once in a situation of high stress—she saw him for a moment before he beat her unconscious. (*Lemcke, supra*, 11 Cal.5th at 650.) There was no video or other evidence from which the defendant could be identified. (*Ibid.*) In this case, crucially, there were two eyewitnesses who identified defendant, one of whom had known defendant and his wife for several years. Thus, the "particular concerns" raised in *Lemcke* are not present here. (*Lemcke, supra*, 11 Cal.5th at p. 666 [The certainty instruction "raises particular concerns in a case like this one, where the conviction was based almost entirely on the testimony of a single witness who expressed certainty in her identification and had no prior relationship with the defendant."].)

Further, Anderson did not express unmitigated certainty but rather claimed at trial that she did not see defendant shoot the victim, contrary to her prior statements. The other eyewitness, Lewis, had the opportunity to initially observe defendant that night at the bar and then when he left the party with Ratliff, as distinct from the momentary viewing of the defendant in a high stress situation by the victim in *Lemcke*. Thus, the certainty factor was less relevant, and therefore less concerning, in this case.

There was also significant corroborating evidence here, including surveillance footage placing defendant at the party with the victim minutes before the shooting. Video footage showing a red SUV heading south from the scene, moments after two gunshots were fired, matched cell phone records for defendant and Ratliff, and records showed Ratliff owned a red Dodge SUV. The witnesses' statements were consistent in significant detail, and they were consistent with the evidence at the scene. The jury could also consider defendant's flight from the scene and his statement to police that Ratliff was an "innocent bystander" as evidence supporting his guilt.

Moreover, defendant "was permitted to present" a substantial case through cross-examination and argument "to combat" the inference arising from CALCRIM No. 315 that certainty equates to accuracy. (*Lemcke, supra*, 11 Cal.5th at p. 658; see also *People v. Wilson* (2024) 16 Cal.5th 874, 908-909 (*Wilson*).) Defense counsel vigorously challenged the identifications made by both Lewis and Anderson, questioning their motives, sobriety, and ability to

10

observe the incident, and focusing on the discrepancies between their reports and the other evidence.  He also challenged the timing of the identifications and questioned the investigating officer's decision to present a surveillance photo of defendant to Lewis for identification rather than the standard six-pack lineup.  Although defendant did not call an expert on eyewitness identification, as the defendant did in *Lemcke*, there is no evidence that he was denied the opportunity to do so.

Further, as in *Lemcke*, witness certainty was one of many factors for the jury to consider—in defendant's case, CALCRIM No. 315 listed 13 other factors relevant to the accuracy of an identification.  (See *Lemcke, supra*, 11 Cal.5th at pp. 659–660 ["We therefore fail to see how a due process violation could be found in a case like this one, where the [certainty] instruction merely directed the jury that it should consider the eyewitness's level of certainty as one of 15 enumerated factors."].)  In addition, the jury was properly instructed on its role in evaluating a witness's reliability and the prosecution's burden of proof.  (*Lemcke, supra*, 11 Cal.5th at pp. 658, 660; *Wilson, supra,* 16 Cal.5th at p. 909.)  The trial court instructed that the jurors alone must judge the credibility or believability of witnesses (CALCRIM No. 226); that they should evaluate "anything that reasonably tends to prove or disprove the truth or accuracy of" the witnesses' testimony (CALCRIM No. 226); that the prosecution bore the burden of proving guilt beyond a reasonable doubt, both as a separate instruction (CALCRIM No. 220) and within CALCRIM No. 315; and that defendant must be presumed innocent (CALCRIM No. 220).

Thus, in the context of the instructions as a whole and the trial record, we are not persuaded that the absence of the cautionary language regarding certainty from CALCRIM No. 315 interfered with the jury's ability to assess the reliability of the witnesses' identification, much less infused the trial with such unfairness that it violated defendant's due process rights.  (See *Lemcke, supra*, 11 Cal.5th at p. 655; *Wilson, supra,* 16 Cal.5th at p. 909.)

To the extent that defendant also asserts that the instruction was a violation of state law that did not rise to the level of constitutional error, we find that any such error was harmless. Instructional error is subject to the harmless error analysis set forth in *People v. Watson* (1956) 46 Cal.2d 818.

11

(See *People v. Beltran* (2013) 56 Cal.4th 935, 955 ["'[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated' in *Watson*."].) Prejudice is established when a reasonable probability exists that had the erroneous instruction not been given, the appellant would have obtained a more favorable outcome at trial. (See *ibid.* [error prejudicial only where "reasonably probable that the jury [ ] was misled to defendant's detriment"]; see also *Wilson, supra,* 16 Cal.5th at p. 909.)

Defendant contends the error was prejudicial for three reasons: (1) the "prosecution's heavy reliance on eyewitness certainty" during testimony and in closing arguments; (2) the "lack of safeguards that mitigated prejudice in *Lemcke*"; and (3) the "weaknesses of the eyewitness identifications." We disagree with all three assertions.

First, although the prosecutor did refer to Lewis's statement that she "can't get [the shooter's] face out of my head," he did so only briefly, did not refer to or quote from CALCRIM 315's "How certain was the witness when he or she made an identification?" factor, and did not expressly argue that being positive (or certain) correlates with accuracy. To the contrary, the prosecutor focused the bulk of his argument on detailing the ways in which the other evidence corroborated the eyewitness testimony given by Lewis and Anderson.

Second, as we have discussed, the only "safeguard" absent from this case that was present in *Lemcke* was the introduction of expert testimony on eyewitness identification. We disagree with defendant's characterization of that opinion as primarily reliant on the use of expert testimony to counter the concerns with the certainty instruction. Moreover, this case presents additional factors lessening the impact of any instructional error, the most important being testimony by two eyewitnesses, one of whom knew defendant prior to that night.

Finally, the evidence of defendant's guilt was substantial. Unlike *Lemcke*, in this case, one of the eyewitnesses knew defendant prior to the shooting, and her testimony was largely consistent with the second

12

eyewitness. The eyewitnesses' testimony was further bolstered by significant corroborating evidence connecting defendant to the shooting.

Thus, on this record, we cannot say a more favorable result was reasonably probable for defendant if the trial court had omitted the certainty factor from CALCRIM No. 315 or given the additional cautionary language.

## DISPOSITION

The judgment of the trial court is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COGLIATI, J.*

We concur:

ZUKIN, P. J.

MORI, J.

---

* Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.